# THE STATE v. MICHAEL McNAMARA, Appellant.

### Division Two, May 19, 1908.

1. **EVIDENCE: Murder: Statements Made by Defendant.** Defendant was charged with shooting his wife, and a witness swore that some time prior to the homicide he took deceased and her baby to defendant's house and when he arrived there defendant said to him, "Take her, G—d d—n you, and keep her if you want her," and thereupon he took her back to her mother. *Held*, competent evidence.

2. ———: ———: **Statements Made by Deceased.** Statements made by the deceased wife to the witness prior to the time he took her back to defendant's house, to the effect that she was afraid to stay with defendant, are not competent.

3. ———: ———: **Statements by Witness to Defendant.** Inquiries made of defendant, by a witness, in the presence of deceased, her mother and others, as to why he had tried to make deceased do a disgraceful act (naming it), of which the witness could have known only by hearsay, where defendant's answer cannot with fairness be construed as an admission of the truth of the imputed indignity, were unfair and prejudicial, and an insidious way of getting the revolting act before the jury, and reversible error.

4. ———: ———: **Assaults on Other Women.** Testimony that prior to the killing of his wife, defendant had on two occasions attempted to outrage the witness, in the absence of deceased, being entirely distinct offenses and having no connection with the murder, is incompetent, where it has no tendency to show a motive for the homicide or a desire to get rid of the wife. [Distinguishing State v. Duestrow, 137 Mo. 86, and State v. Callaway, 154 Mo. 111.]

5. **MURDER: Peremptory Instruction.** A peremptory instruction to the jury to find defendant guilty, leaving to them merely the fixing of the grade of the offense, thus, "The jury are further instructed that in this case there is no justification and no excuse in law, and you must find the defendant guilty under the law of this State of either murder in the first or murder in the second degree, or manslaughter in the fourth degree," etc., is error, and violative of the constitutional guaranty of trial by jury. No court can direct a verdict of guilty.

6. ———: Insanity: Instruction.    Where defendant shot his wife
as she was about to retire to a room in an assignation house
with a paramour, and testified that upon his appearance and
her cry of "Murder," he went insane and lost all his sense of
reason and while in that state supposed he shot her, the court
did not err in refusing to instruct as to defendant's mental ir-
responsibility, as there was no evidence tending to show that he
was insane.

Appeal from St. Louis City Circuit Court.—*Hon. Moses N. Sale,* Judge.

REVERSED AND REMANDED.

*C. P. Johnson* and *Silver & Brown* for appellant.

(1) The court committed reversible error in per-
mitting witness Thomas Gleason to testify to the mat-
ters set out in the record. The evidence so admitted
was wholly foreign to the crime for which defendant
was on trial; was intended to and necessarily had the
effect of inflaming the minds of the jurors against him,
and thereby prejudicing them against him, not only
on the question of defendant's guilt or innocence, but
likewise on the matter of the assessment of punish-
ment. See authorities, *infra,* as to inadmissibility of
evidence of other offenses.    (2) The court further
committed reversible error in admitting the evidence
of the witness Mrs. Margaret Gaskill as to the alleged
assault made on her in November, 1904, and also as
to the alleged assault by defendant on the witness in
April, 1905. The evidence related to altogether dif-
ferent offenses from the one for which defendant was
being tried, had no connection with the latter or with
defendant's deceased wife, and was calculated to in-
flame the minds of the jurors to the highest pitch
against defendant, and its admission was gross and
obvious error. State v. Spray, 174 Mo. 569; State v.
Boatright, 182 Mo. 51. Error is presumptively harm-
ful, and it devolves on the party who commits it to

show that it could not possibly have resulted in injury. State v. Shipley, 174 Mo. 513. (3) The court committed error in giving instruction 13. The first clause is a peremptory instruction in the most unqualified terms to return a verdict of guilty; is a directed verdict in a criminal case, and is clearly erroneous. As a verdict of acquittal cannot be set aside, an instruction directing a verdict of guilty is not permissible. Const., art. 2, secs. 22, 28; State v. Hamey, 168 Mo. 182; State v. Vaughan, 200 Mo. 1; United States v. Taylor, 3 McCrary 502; State v. Bockstruck, 136 Mo. 358. Nor can it be justly contended that the instructions subsequently given by the court on reasonable doubt extracted the poison and cured the error. (a) First, as stated above, error is presumptively harmful, and it devolves on the party availing himself of it to show that it could not possibly have resulted in injury. State v. Shipley, 174 Mo. 513. (b) The instruction complained of is necessarily in conflict with that on reasonable doubt given by the court; one peremptorily instructs the jury that "in this case there is no justification or excuse in law, and you must find the defendant guilty under the law of this State of either murder in the first degree or murder in the second degree;" the other informs the jurors that if they have a reasonable doubt of defendant's guilt, they should acquit. The instructions being so diametrically opposed to each other, it was impossible for the jury to say which one should control them; the outcome, however, of the case would indicate that they obeyed the peremptory one. Conflicting and contradictory instructions constitute reversible error. Mansur, etc., v. Ritchie, 143 Mo. 588; State v. Grugen, 147 Mo. 39; Modisett v. McPike, 74 Mo. 636; Spillane v. Railroad, 111 Mo. 556; Buddenberg v. Railroad, 108 Mo. 394. (4) Defendant testified to the effect that when he saw his wife in the place of prostitution with Brophy, he lost his

sense of reason, became insane; that he was crazy and insane at the time of the shooting, and did not know or remember of shooting his wife until after he saw her lifeless body lying in the hall on the floor. This afforded a basis for an instruction on defendant's mental state, and as to his irresponsibility for the homicide, and an instruction was requested on that feature of the case and was refused, which was error.

*Herbert S. Hadley,* Attorney-General, and *N. T. Gentry,* Assistant Attorney-General, for the State; *Arthur N. Sager* of counsel.

(1) Counsel for defendant contend that the court committed reversible error in permitting the witness Gleason to testify, as set forth in the record. Mr. Gleason was an uncle of the deceased, and took her and her baby back to the defendant's home one night in January preceding the homicide. The deceased and her baby had not been staying with the defendant for some time, and the defendant had been living at home by himself. On entering the defendant's home, the defendant said to the witness, "God damn you, take her home and keep her." The witness tried to explain to the defendant that that night, being very cold, was a bad time to send his wife and baby out from home, but the defendant would not listen to him. At another time, this witness visited the defendant's home and asked the defendant, in the presence of the deceased, why he had tried to make the deceased do a disgraceful act (mentioning the act), and the defendant replied, "It is none of your God damn business. Get out of my house." At the same time, the defendant reached for his pistol and tried to assault the witness. It is insisted by the defendant that the admission of such evidence had the effect of improperly and unjustly inflaming the minds of the jury against him, and prejudicing them against him, both on the

question of his guilt, and likewise on the assessment of the punishment. In this insistence the defendant is in error. It has always been considered competent to prove that the husband, who is charged with the murder of his wife, has been guilty of gross indignities, as well as brutal treatment of his wife. Such evidence tends to show an unfriendly feeling for her, and is proper for the consideration of the question of the murder of the wife by the husband. State v. Reed, 117 Mo. 607; State v. Callaway, 154 Mo. 99; State v. Duestrow, 137 Mo. 44; 25 Amer. Dig., col. 532; 26 Amer. Dig., cols. 486 and 525. (2) No error was committed by the trial court in admitting the evidence of State's witness Mrs. Margaret Gaskill, to the effect that, prior to her marriage, the defendant assaulted her on two occasions; the first time offering her money to have sexual intercourse with him, and then jerking the sleeve of her dress out in an effort to force her, and the second time in throwing her down on the floor, getting on top of her and trying to have connection with her. Counsel for defendant are in error as to the object of such evidence; it was not introduced for the purpose of proving other offenses against the defendant, but for the purpose of proving his lack of respect and love for his wife, and consequently a desire on his part to get rid of her. State v. Duestrow, 137 Mo. 86; Wharton's Crim. Evidence, sec. 785; Garlitz v. State (Md.), 4 L. R. A. 601. The authorities cited by appellant (State v. Spray, 174 Mo. 569, and State v. Boatwright, 182 Mo. 34), are not in point, and do not sustain his contention. State v. Callaway, 154 Mo. 110; State v. Punshon, 124 Mo. 456; People v. McCann, 3 Park. Crim. 294; People v. Williams, 3 Park. Crim. 84; Hall v. State, 40 Ala. 698; Duncan v. State, 88 Ala. 31; Johnson v. State, 94 Ala. 35; State v. Hinkle, 6 Iowa 380; People v. Nileman, 8 N. Y. St. Rep. 300; People v. Wilson, 109 N. Y. 345; People v. Harris, 136

N. Y. 423; Wilkerson v. State, 31 Tex. Crim. Rep. 86.
All of the testimony complained of by appellant in
points one and two of the brief are admissible on still
another ground. They are admissible for the purpose
of showing the defendant's estimate and appreciation
of marital relation and fidelity and the improbability
that he was shocked and overcome in the manner de-
scribed in his testimony. Garlitz v. State (Md.), 4
L. R. A. 605; Harris v. State, 40 Tex. Crim. Rep. 8;
Morrison v. Com., 67 L. R. A. 529; Farris v. People,
4 L. R. A. 584; State v. Holme, 54 Mo. 164. (3) Re-
ferring to the third point in appellant's brief, to-wit,
the giving of instruction 13, respondent admits that
this is a case wherein the defendant stands charged
with murder in the first degree. The testimony shows
beyond dispute that one of the three degrees of homi-
cide, to-wit, murder in the first degree, or murder in
the second degree, or manslaughter in the fourth de-
gree, had been committed by defendant. State v. An-
derson, 86 Mo. 310. The defendant has a right to have
an instruction based on his own testimony and to tes-
tify as to his intent. State v. Partlow, 90 Mo. 608.
It has also been held, repeatedly, that, whenever the
facts constituting the guilt are undisputed, the trial
court is justified in directing a verdict of guilty. U. S.
v. Anthony, 11 Blatchf. 200; State v. Herold, 9 Kan.
194; People v. Ackerman, 80 Mich. 589; People v. New-
man, 85 Mich. 98; People v. Elmer, 109 Mich. 493;
State v. Moore, 101 Mo. 316; Com. v. Magee, 10 Phila.
201; Burt v. State, 38 Tex. Crim. Rep. 397; State v.
Goff, 65 Mo. App. 498.

GANTT, J.—This is an appeal from the judgment
and sentence of the circuit court of the city of St.
Louis, sentencing the defendant to the penitentiary
for fifteen years for murder in the second degree.

The indictment charged murder in the first degree

by the defendant on the 23d day of August, 1906, at the city of St. Louis, of Mrs. Nellie McNamara by shooting her with a certain pistol charged with gunpowder and a leaden ball, and inflicting upon her one mortal wound of which she instantly died on said day at the city of St. Louis. The indictment is in the form expressly approved by this court in State v. Gray, 172 Mo. l. c. 434, and on many occasions since the announcement of that decision, and for that reason it will not be set forth at length in this opinion.

The deceased, Mrs. Nellie McNamara, was the wife of the defendant and he shot and killed her on the 23d day of August, 1906, in a building known as 1730 Olive street and otherwise known as "The Royal Hotel." The defendant and the deceased were married in the city of St. Louis on the 29th of November, 1903, and went to housekeeping immediately after their marriage, on Bacon street in St. Louis, and kept house there until about April 23, 1905. One child, a boy, was born of this marriage. About April 23, 1905, they broke up housekeeping and began to board with the mother and father of the deceased and continued to do so until about December 4, 1905. On the last-mentioned date they moved to a flat on Benton street and lived there. On March 19, 1906, the deceased left the defendant and went to live with her mother, taking the child with her. The defendant continued to live in the flat for about two weeks after the deceased left him. After the deceased had left the defendant she went with a friend of hers to the house and gathered up some of her child's clothes, a high-chair and a go-cart and carried them to her mother's. The deceased continued to live with her mother, Mrs. Mansur, until the day of the homicide, except that she, the last month before her death, rented a room from Mrs. Graham on Glasgow avenue, where she stayed at night, but continued to be with her mother during the day. The

evidence tended to show that during this last month, the defendant agreed to pay her thirty dollars per month out of his salary for the maintenance of herself and child and the evidence tends to show that he did pay her that sum about the first of August. During the time that she was separated from her husband and resided at her mother's house, and during the time that she lived at the Glasgow avenue house, the evidence tends to show that the defendant visited her constantly at night and would sit out and talk with her for several hours each evening. There was also evidence that during this time they would have wordy altercations. Defendant also took his wife, during their separation, out to Delmar Garden and Meramec Highlands. The evidence tends to show that before the homicide, the defendant had suspicion of infidelity on the part of the deceased. There was much evidence on the part of the State to the effect that the defendant did not provide suitable clothing and necessaries for his wife, the deceased, and his child. It seems that one one occasion while living with her mother the deceased threatened to get a divorce so that defendant would let her alone, and he said to her: "Get a divorce, G — d d — you, but if you had ten thousand divorces, you will still be my wife, and the first man I see with you, I will kill you." On the part of the State the evidence tended to show that on the afternoon of the homicide, the defendant, who was a police officer of the city of St. Louis, was excused from duty by police sergeant Sullens an hour sooner than usual, as the defendant said he wished to go with his wife to see a physician and consult about their baby's health; instead, however, the defendant visited McDonough's grocery store on Leffingwell avenue, and was seen there a little before seven p. m. by Joseph Mulligan. The defendant was sitting down on a sugar barrel in front of said store, the store being about one-half a block

from and in view of the residence of Mrs. Mansur, the mother of the deceased, where the deceased was then living.

The Royal Hotel was situated at 1730 Olive street, St. Louis, and Charles Brown was the hotel clerk at that time. Brown testified that he saw the deceased walk into the hotel office in company with a man who turned out to be Brophy, and that Brophy took a pen and registered under the name of J. C. Wilson and wife, and asked for a room for himself and wife. The deceased had stopped a little ways from the office counter and was standing there when the defendant came into the office. Brown heard the deceased cry out, "Murder. Tell that man to run." The defendant had taken hold of the deceased by the hand, and was pulling her along towards the desk and ran against Mr. Brown. The defendant said, "That is my wife," and fired at Brophy. Brophy ran down the hall and defendant followed him, overtaking him, and after a scuffle defendant grabbed hold of Brophy around the neck and fired four or five times in succession. During this firing Brown concealed himself behind the counter and did not see the shooting of defendant's wife, but saw her dead body a few minutes later.

Edward Freeman, porter of the Royal Hotel, testified that when the defendant came into the hotel the deceased was standing ten or twelve feet from the swinging doors of the toilet room and the defendant addressed the witness and said, "That is my wife. Where is the man." The deceased turned and started for the door leading down the side entrance, and the defendant caught hold of her and pulled her down the hall towards the clerk's desk where Brophy was standing and the first shot was fired at Brophy. The porter took refuge in a room to one side and heard five or six shots. The defendant then ran out of the hotel office and the porter came out into the hall and saw Brophy's

dead body lying on the floor and the body of the deceased lying on the steps leading to the street.

A post-mortem was held and the physician testified that he found a gunshot wound in the body of the deceased, which entered in front, passed through the aorta and came out near the spinal column. This wound was made by a 38-calibre bullet and was a mortal wound.

Police officer Joyce stated that he was in the neighborhood of Eighteenth and Olive, at the corner where the Royal Hotel was located, on the evening of the homicide about 8 o'clock, when he heard four or five shots. He says that after the shots were fired he saw a man running out the Eighteenth street entrance of the Royal Hotel towards Pine street, and he and officer O'Brien followed him to Pine street where the man said something to a driver of an ambulance, which was passing; that when they reached him they found it was the defendant, McNamara, and when asked who did the shooting he said, "He will never ruin any body else's home. I shot my wife and the man I caught with her at the Royal Hotel." They then took him to the hotel and the defendant said, "The man is in there," meaning the hotel. O'Brien stayed outside with the defendant, and Joyce went up stairs, passing the body of Mrs. McNamara on the steps. After reaching the second floor, Joyce walked down the hall, passed the clerk's desk into another hall and found Brophy lying on his face dead.

At police headquarters, defendant made a statement to Chief Desmond, in which he said he had shot his wife first and then shot Brophy. O'Brien testified substantially as Joyce did, and added that when asked who the man was, defendant said, "I do not know." And when asked where the revolver was, said, "Here it is," and he pulled it out and handed it to the officer. Defendant was dressed in citizen's clothing and had

a handkerchief over his neck and was wearing a slouch hat.

The defendant's account of the circumstances immediately preceding the tragedy is substantially as follows: That he had been to see his wife three nights in succession before the killing and on the night of that occurrence he had returned from his duties as a police officer; he was going to see his wife; that he had on his way reached the corner of Leffingwell avenue and Howard street about seven o'clock or a quarter to seven on the evening of August 23, 1906, when he saw his wife coming out of the house "all dressed up;" that she went east and defendant followed her and saw her get on a Jefferson avenue car, and defendant also got on the car and stood on the rear platform; that the deceased got off at Olive street and a man met her there, and helped her to alight from the car; that this man was a stranger to defendant, he had never seen him before or since; that deceased and the stranger got on an Olive street car going east and defendant got on the same car, riding on the rear platform; that the car went from Olive on Twenty-first to Pine street and down the latter street; that deceased and her companion got off the car at Pine street between Eighteenth and Nineteenth streets and walked over to Olive on the east side of Eighteenth to the southeast corner of Eighteenth and Olive; that at this place the stranger tipped his hat and left the deceased and she was joined by another man, who later turned out to be Brophy; that deceased and Brophy went west then to Olive street on the south side to the west side of Nineteenth street to the corner of the latter street and Chestnut and stood there talking for about five minutes or perhaps ten minutes, and then walked east on Chestnut to the east side of Eighteenth street, then they went north on Eighteenth street on the east side to the door of a hotel and stopped there about a half of a minute

and then went upstairs in the hotel; that defendant did not know the man (Brophy); that it was about ten minutes before eight o'clock; as a police officer, defendant knew the character of the hotel, to-wit, that it was an assignation house. He then related the circumstances immediately following in this wise: "They went upstairs and I followed in about a half of a minute, or probably a minute. I got up the stairs and just as I got to the head of the stairs, I saw my wife standing in the hallway and she hollered, 'Murder! tell that man to run,' and as she did I started to run past her and she grabbed at me, and I got to the end of the hall where the desk was. It is like an L shape, and there I saw this man Brophy with a pen in his hand, he still had the pen in his hand, and after that I did not know what had happened until I was coming back out of the hall and I saw my wife lying there." Asked what was the effect of all that happened, defendant answered: "I just got nervous and lost my head completely; I went what you might say insane; I did go insane and lost all my sense of reason as soon as I heard her say, 'Murder! Tell that man to run;' I knew they were there for the purpose of committing some deed or crime, I did not want my wife to do, and when she hollered that way, I lost my sense of reason." He stated that he first realized what had occurred after he came out of the hallway and saw his wife lying on the floor. He took her up and carried her down stairs after he found what he had done. He stated he had no recollection of shooting her at all, but after he saw her lying there he thought probably he had done it. The defendant's evidence tended to prove that prior to this trouble his general reputation as a peaceable man was good. In testifying in his own behalf he generally denied and qualified the statements as to his alleged abuse of his wife and denied

212 Sup—11

that he failed to support her during their separation.

In rebuttal the State proved by Frank Lawson, a reporter of the St. Louis Republic, and John Hendricks, a reporter of the Post-Dispatch, that they had had a conversation with the defendant after he was arrested and taken to the holdover. To Mr. Lawson he stated that he had followed his wife and her companion around the block and had watched them enter the Royal Hotel and then followed them in. He saw his wife in the corridor and passed by her, shot Brophy, then turned and shot his wife; that he heard an ambulance passing, ran down and stopped it, and stooping over kissed his wife as she lay on the floor. To Hendricks he detailed the facts leading up to his entrance to the Royal Hotel and then said, "You know what happened then as well as I do."

The court instructed the jury on murder in the first degree, second degree, and manslaughter in the fourth degree. The instruction on murder in the first degree fully defined the technical terms, willfully, deliberately, premeditatedly and with malice aforethought as they have often been explained with the approval of this court, and we discover no error therein. And the same may be said as to the instruction on murder in the second degree and manslaughter in the fourth degree. The only instruction seriously challenged on this appeal is the one numbered thirteen, which is as follows:

"The jury are further instructed that in this case there is no justification and no excuse in law, and you must find the defendant guilty under the law of this State of either murder in the first degree or murder in the second degree, or manslaughter in the fourth degree. There is no unwritten law and no written law in this State that justifies or excuses a husband in taking the life of his wife, because she is about to commit adultery, or because she has committed adultery, or

because she is caught under the circumstances and in such a place as to reasonably cause her husband to believe that she is about to commit an act of adultery. Taking human life under such circumstances is a crime under the law of this State, and is either murder in one of the degrees mentioned or manslaughter in the fourth degree. Whether it is one or the other—i. e., whether it is murder in either the first or second degree, or whether it is manslaughter in the fourth degree, the jury must determine from all the evidence in this case, and under the instructions herein given to them by the court.''

The court fully instructed the jury on the presumption of innocence and reasonable doubt, previous good character of the defendant and the credibility of the witnesses, defendant's right to testify in his own behalf, etc. The jury found the defendant guilty of murder in the second degree and assessed his punishment at fifteen years in the penitentiary.

The defendant seeks a reversal of the judgment on the following grounds:

I. It is insisted that the court committed reversible error in permitting the witness Thomas Gleason to testify that in January, 1906, before the separation of the defendant and his wife, on one occasion Mrs. McNamara had come to her mother's house with her baby, and it was very cold weather, and the witness Gleason took her and her baby back to the defendant's house and when he got there the defendant said to him, "Take her, G— d—— you, and keep her if you want her.'' Prior to that she had told witness that she was afraid to stay with the defendant and he brought her back home, and thereupon, after the defendant had made the above statement to him, the witness brought her back to her mother's and went on about his work. What Mrs. McNamara, the deceased, said to the witness Gleason was clearly hearsay and

incompetent and of itself was no evidence that de-
fendant had mistreated his wife, but the statement of
the defendant to the witness when he brought Mrs.
McNamara and her baby back to the defendant's home
that "he could take her and keep her if he wanted
her," evinced a bad state of feeling on the part of
the defendant to his wife and we think under the rul-
ings of this court in State v. Callaway, 154 Mo. l. c.
110, was competent for that purpose; but as to the
other incident related by this witness which occurred
in June, 1904, at the flat occupied by the defendant
and his wife on Bacon street, when Mrs. Mansur and
a Mrs. Gaskill, the defendant and the deceased and
the witness were all present, it should have been ex-
cluded. It was an unfair and insidious way of getting
the witness's own statement of a most revolting and
highly prejudicial occurrence before the jury when the
witness could not have known of it except by hearsay.
We regard this as a most harmful error and well cal-
culated to prejudice the jury against the defendant.
What Gleason said to the defendant was no evidence
of the truth of the facts assumed in such statement
and yet it could only have been admitted on the ground
that such assumed fact tended to show brutal conduct
on the part of the defendant towards his wife and
tended to show malice. The alleged answer of the
defendant to said statement cannot with any fairness
be construed as an admission of the truth of the im-
puted indignity and outrage, but on the contrary it
resulted in the summary eviction of the witness from
the defendant's house according to the witness's own
statement.

II.   It is next insisted that error was committed
in permitting Mrs. Gaskill to testify to two assaults
made by defendant on her prior to her marriage, at
his house, in the absence of his wife, in the years 1904
and 1905, on the ground that they tended to prove

entirely distinct and different offenses, having no connection with the murder of his wife, and were calculated to inflame the minds of the jury against defendant. The admission of this evidence is defended by the State on the authority of State v. Duestrow, 137 Mo. 1. c. 86, and State v. Callaway, 154 Mo. 1. c. 111. The ground upon which this class of testimony was held to be admissible in State v. Duestrow, supra, was that it tended to show a motive on the part of defendant to rid himself of his wife. [Wharton's Criminal Evidence, 785.] And this was one of the grounds for admitting like testimony in State v. Callaway, supra, but it was also admitted in the last-cited case on the further ground that it tended to show a want of affection and a desire to obtain a divorce. It was upon the first ground, to-wit, a motive to get rid of his wife, that it was held competent in Stout v. People, 4 Park. Crim. 1. c. 137, 138; State v. Rash, 12 Iredell Law 382; Templeton v. People, 27 Mich. 501. In those cases the evidence tended to show a continued criminal intimacy between the defendant and a third party which disclosed a motive to get rid of the husband or wife in order to give full opportunity to gratify illegal desires. There is no pretence in this case that there had been any long sustained criminal intimacy or any intimacy whatever between Mrs. Gaskill and defendant; on the contrary, her evidence tended to show a strong repugnance to defendant, and she had been married for months before the homicide and there was no evidence that defendant was enamored of her. There was no evidence that he killed his wife in order to get her out of the way of an alliance with this witness, either lawful or unlawful; so that, so far as establishing a motive to be rid of his wife on account of Mrs. Gaskill, the evidence was absolutely without significance or probative force. Moreover, in this case there is no doubt about who committed the homicide,

neither did the evidence leave any doubt as to the un-
happy relations existing between the defendant and
his wife or of his suspicions of her infidelity.  While
we recognize the authority of the decisions in State
v. Duestrow and State v. Callaway, and approve the
doctrine therein announced upon the facts therein ap-
pearing, and especially in cases where there is a doubt
as to the identity of the murderer, or where the exist-
ence or non-existence of a motive tends to prove or dis-
prove the defendant's guilt, we are of the opinion that
in this case where there were no such questions the
evidence of Mrs. Gaskill had no tendency to demon-
strate to the jury the state of defendant's feeling to-
ward his wife, but simply tended to prove distinct of-
fenses, wholly disconnected with the killing of his wife,
and the effect of it was simply to prejudice defendant
in the minds of the jury.

III.   Did the circuit court err in giving instruction
numbered 13 set out in the statement?  It will be ob-
served that the court instructed the jury there was no
justification or excuse in law and they *must find the
defendant guilty under the law of this State* of either
murder in the first degree or murder in the second
degree or manslaughter in the fourth degree.  In a
word, this was a peremptory command to the jury to
find defendant guilty and left to them merely the fixing
of the grade of his offense.  The question presented
is of the gravest import.  The Constitution of Missouri
provides that "the right of trial by jury, as hereto-
fore enjoyed, shall remain inviolate." [Art. 2, sec. 28.]
By section 22 of article 2, every person accused of
crime is guaranteed "a speedy, public trial by an im-
partial jury of the county."  By section 23 of article
2 of the Constitution it is further provided:  "Nor
shall any person, after being once acquitted by a jury,
be again, for the same offense, put in jeopardy of life
or liberty."  As said by this court in State v. Os-

State v. McNamara.

trander, 30 Mo. 1. c. 19, "In the spirit of these constitutional provisions, the Legislature has passed laws marking, with great exactness, the line separating the power and duties of the judge from those assigned by the Constitution and laws to the jury. The right of a jury, in a criminal prosecution, to determine the facts, without regard to the views of the judge who presides at and conducts the trial, is secured by the most stringent enactments. The judge is confined to an exposition of the law; he is not permitted, 'on the trial of the issue on any indictment, to sum up or comment upon the evidence, or charge the jury as to matter of fact, unless requested so to do by the prosecuting attorney and the defendant or his counsel;' and his instructions upon points of law are required to be in writing. [R. S. 1855, p. 1195, sec. 31.]" The same section is now found in the revision of 1899, section 2639. The right of a court in the trial of a criminal prosecution to direct a verdict of guilty has been considered by both the State and Federal courts of this country and it is believed that the case of the United States v. Anthony, 11 Blatchf. 200, decided by Mr. Justice HUNT on the circuit, and several cases in Michigan, are the only cases in the United States in which it was ruled that the trial court could direct a verdict of guilty. The point was directly raised and adjudged in United States v. Taylor, 3 McCrary's Rep. 500, in which the United States District Court directed the jury to return a verdict of guilty without retiring. On appeal, Judge McCRARY summed up the law and the decisions on the question and reversed the judgment of the district court, saying that with the single exception of United States v. Anthony, 11 Blatchf. 200, the authorities were with entire unanimity against the right of a court in a criminal case to direct a verdict of guilty. Referring to the Sixth Amendment of the Constitution of the United States guaranteeing to an

accused "a speedy and public trial by an impartial jury of the State and district wherein the crime shall have been committed," he said this is a right which cannot be waived. "It is," said the learned judge, "very difficult to see upon what principle it can be maintained that an accused has had a trial by an impartial jury, within the meaning of the Constitution, in a case where the court has directed the jury, without deliberation, to find him guilty. It would seem that such a trial is, in substance and effect, a trial by the court quite as much as in a case where a jury is waived by consent," and yet it has frequently been held that a trial of a felony before the court by the prisoner's consent, is error. [State v. Maine, 27 Conn. 281.] "A verdict of acquittal cannot be set aside, and, therefore, if the court can direct a verdict of guilty, it can do indirectly that which it has no power to do directly." [U. S. v. Taylor, 3 McCrary, l. c. 505.] This opinion was concurred in by Mr. Justice MILLER. See, also, Huffman v. State, 29 Ala. 40; Parker v. State, 34 Ga. 262; Tucker v. State, 57 Ga. 505; Com. v. Van Tuyl, 1 Metc. (Ky.) 1; Com. v. Porter, 51 Mass. 263. Further citations are unnecessary. It is the universally accepted law of this State that a court in the trial of a criminal prosecution cannot direct the jury to return a verdict of guilty, and we can find no decision to the contrary in this State. The instruction was clearly erroneous in our opinion.

We are cited by counsel for the State to several decisions of the Supreme Court of Michigan, in which directions to find the defendant guilty have been affirmed, but in People v. Neumann, 85 Mich. l. c. 103, 104, the previous cases were referred to by Judge MORSE and discussing such a practice he says: "But it has been repeatedly held that he cannot in so many words direct them that they *must* bring in a verdict of guilty; and that they are at liberty to find other-.

wise, if they see fit, under the Federal Constitution, which guarantees to every accused person 'the right to a speedy and public trial by an impartial jury of the State and district wherein the crime shall have been committed.' And verdicts have often been set aside when directed by courts in opposition to this right. [U. S. v. Taylor, 11 Fed. 470, and cases cited.]'' Great as is our respect for that learned court, we think its decisions on this question are contrary to the almost unbroken line of authority in the United States, and as for ourselves we are bound by the Constitution of this State to hold that no court in Missouri has the power or right to direct a verdict of guilty, in the face of our constitutional guaranty of trial by jury, our statute forbidding the judge to sum up or comment on the evidence.

IV. There was no error in refusing to instruct the jury as to defendant's mental irresponsibility. There was no evidence tending to show defendant was insane. [State v. Ward, 74 Mo. l. c. 257; State v. Callaway, 154 Mo. l. c. 110.]

For the error noted in giving instruction thirteen directing a verdict of guilty and in the admission of the testimony of Gleason as indicated in the opinion and the evidence of Mrs. Gaskill as to the assault upon her, the judgment is reversed and the cause remanded for a new trial.

*Fox, P. J.,* and *Burgess, J.,* concur.