THE STATE v. FRANK DELCOUR, Appellant.

Division Two, February 23, 1923.

1. **ASSIGNMENTS: Overruled Motions Not Preserved in Record.** Assignments in the motion for a new trial that the court erroneously overruled appellant's application for a continuance, his plea in abatement and his motion to quash the information, cannot be considered on appeal if none of these motions is included in the record.

297 Mo.—21

2. **EVIDENCE:** **Statements by Defendant.** It is proper to admit in evidence statements relating to the killing of deceased made by defendant after the killing.

3. ————: **Striking Out: Specific Reason.** To authorize the appellate court to consider a complaint that the trial court erred in refusing to strike out certain testimony offered by the State, appellant must, at the time he moved to srike it out, have offered some specific reason why it should be stricken out. A general objection in a motion to strike out testimony already given is not sufficient.

4. **ARGUMENT TO JURY:** **Non-Prejudicial.** Improper argument to the jury by counsel for the State, if not prejudicial, is not error.

5. ————: ————: **Abolition of Capital Punishment.** A statement by counsel for the State in his argument to the jury that capital punishment had been abolished by the Legislature at one time, was not prejudicial to a defendant on trial for a most brutal murder and convicted of murder in the second degree.

6. ————: ————: **Deceased Represented by Jury.** A statement by counsel for the State in his argument to the jury that "the jury represented" deceased, was not a true statement of the law, as the jury under their oaths must have known, but was purely fervid oratory, and was in no wise calculated to arouse in the jury a sympathy for deceased or a prejudice against defendant greater than the facts in evidence tended to create.

7. **INSTRUCTION:** **Self-Defense: Directing Verdict of Guilty Without Finding Facts.** An instruction telling the jury that before they can acquit defendant on the ground of self-defense they must find that he had reasonable ground to believe or apprehend and did believe or apprehend that deceased was about to inflict upon him some great personal injury or bodily harm, and that such danger was imminent and impending, "and unless you so believe you should find the defendant guilty and assess his punishment as provided in these instructions," would be erroneous in directing a verdict of guilty of murder without requiring a finding of all the facts necessary to such conviction, if defendant had denied his presence at or participation in the homicide and the evidence of self-defense had been developed from witnesses other than himself, or if he had not taken the witness stand and admitted the killing. But where the defendant testified in his own behalf and solemnly admitted the killing, and under all the evidence the homicide was either murder or justifiable on the ground of self-defense, and other instructions eliminated justification unless the killing was done under reasonable apprehension of great bodily harm, leaving, if the jury did not so find, as the only alternative, guilt of murder and the assessment of the punishment, the giving of said instruction was not reversible error.

Appeal from Shannon Circuit Court.—*Hon E. P. Dorris,* Judge.

AFFIRMED.

*Jesse W. Barrett,* Attorney General, and *R. W. Otto,* Assistant Attorney-General, for respondent.

An inspection of the record proper filed in this cause by the appellant will disclose to the court the fact that the filing of an affidavit in appeal is not mentioned therein, nor is there found therein any mention of the granting of an appeal by the trial court. Therefore this court has no jurisdiction of the cause and the appeal should be dismissed.

DAVID E. BLAIR, P. J.—Tried for murder in the first degree and convicted of the second degree of that offense, wherein imprisonment for forty-five years was imposed by the jury, defendant has appealed.

The homicide occurred on January 19, 1921, in Shannon County. Defendant (whose correct name appears to be Delcore, instead of Delcour, as charged in the information) killed one Jack Hoover near Blue Spring on Current River.

Delcore was thirty-five years of age. Deceased was apparently much younger, since he is referred to by the witnesses as "this boy Hoover." A number of men and women were gathered at Blue Spring for a picnic and fish fry. The day was Sunday. Near the spring was a house which seems to have been occupied by one Will Holland, and it was at this house that the killing occurred.

Since no question is raised as to the sufficiency of the evidence to authorize submission of the case to the jury on first degree murder, it will be unnecessary to detail the evidence at any length. The testimony on the part of the State tended to show the following facts: Defendant, one Oscar Reistach (or Reisteak) and Evart

Barnhardt went from the home of Tom McCabe, a step-brother of the defendant, to the Blue Spring. At the ford near the spring they saw deceased, Alex Larkin and some women. They reached the spring near noon, and there found Holland and Larkin and others. Defendant and one of the others came on horseback. Defendant was carrying a Winchester rifle.

Defendant and some of his party had been drinking whisky, although the extent of their indulgence is not clear. It seems that defendant had some reason to think the deceased was mad at him. Defendant and Oscar Reistach and Evart Barnhardt found the deceased at Holland's house. He had a weapon in his hand which was described by the witness as a "22 gun." The question of whether deceased was mad at the defendant was then discussed, and deceased denied it. Defendant then insisted upon deceased taking a drink with him and, after some disclaimer of the habit or any desire to indulge, deceased finally yielded and took a drink. Deceased asked defendant if it was true that he had stated that he had come to shoot up the bottoms or tear up the fish fry, or something to that effect. Defendant denied this, and deceased seemed contented and set his gun down in the corner of the porch and then sat down on the other end of the porch at a distance of twelve to sixteen feet away from his gun. The porch was variously estimated at from six and one-half to eight feet wide and from twelve to sixteen feet long. During the conversation, but how long after does not clearly appear, defendant asked deceased who told him he had said he was going to shoot up the bottoms, and deceased refused to tell him, and according to at least one of the witnesses, told defendant he could shoot him before he would tell. Thereupon, defendant lifted his rifle and shot deceased in the face while he was still sitting on the porch at least twelve feet from his gun. He apparently died instantly. It appears from the testimony of Oscar Reistach and Evart Barnhardt that deceased was not making the

slightest attempt at the time of the shooting to reach for his gun or to draw any other weapon or to make any aggression whatever against defendant.

Some of the State's witnesses testified to statements of defendant made prior to the killing, of a general threatening nature, but not specially directed toward deceased. For example, one Laura Moon testified that she heard defendant say, ''Boys, I have just started out, and I am going to be a worse man than Luther McIntire ever was.'' Since we are not enlightened concerning the extent of the depravity of Luther McIntire, we cannot know just how bad defendant intended to be. Other witnesses testified to remarks of a similar character. Presumably Luther McIntire had at least some local reputation as a ''bad man.''

The record is exceedings vague concerning the acts of defendant after the shooting. It rather unsatisfactorily appears that he hid himself in the woods for sometime thereafter and was fed by his friends. That some sort of pursuit was organized appears from defendant's own testimony, wherein he said that two men of the neighborhood, upon one occasion when they were hunting him, shot at him several times. One witness testified that defendant finally came in and gave himself up.

Defendant admitted the killing, but sought to justify his act on the ground of self-defense. There is some testimony by at least two witnesses that defendant told them deceased snapped his gun at him three times and he had to kill him. One of them, John Reisteak, testied that defendant told him Oscar (meaning Oscar Reistach) would swear Hoover snapped his gun at him three times, and that defendant asked said witness to see Oscar and post him up a little better. Defendant denied these conversations and testified that deceased reached for his gun, but did not get to it as it was four or five feet away; that after he was shot he fell toward the gun. Neither of the two disinterested eyewitnesses corroborated defendant's story of the killing. We quote from defendant's testimony as follows:

"A.   We rode up to the fence, the three of us, Barnhardt and Reisteack, and I spoke and Holland and Larkins did not speak.   They went on towards the spring. Holland had a gun and went on towards the spring, and Jack Hoover was standing on the porch with a gun, and he said, 'Frank I heard you have come up here to tear up the fish fry,' and I said I had not done it, and Reisteack commenced apologizing, and he said, 'Alright I will set my gun down then.'

"Q.   Where did he set it?   A.   Down by the door facing; the door was about—hardly middle way of the room, it was nearer one end than the other, and he sat down on the other side of the door, about four or five feet, facing me, and I walked up to the end of the porch and asked him who told him I was going to tear up this fish fry, and he said he would not tell me, and I said, 'Why?' and I asked him again, and he said, 'Shoot if you want to, I won't tell you nothing,' and he reached for his gun and I shot.

"Q.   Which way did he fall when he fell?   A.   Towards his gun.

"Q.   Tell the jury if you thought he was going to get his gun and use it on you?   A.   Sure, I thought he was going to shoot me, that occurred to me.

"Q.   Did he and Holland both come out with the guns when you went up there?   A.   Yes sir, Holland was ahead of him.   Hoover had his gun something like this at first (indicating)."

There was some evidence offered by defendant tending to show bad feeling on the part of deceased toward defendant, and predictions by deceased of trouble with defendant over a gun belonging to deceased.   It appears that one Shelton had broken or bent said gun by striking defendant over the head with it.   Apparently deceased thought defendant ought to pay for the gun, and said they might have trouble.   Charlie Allison, a witness for defendant, testified that deceased said if he had to get into trouble with Delcore, he would want a shell

that had powder in it. It was intimated that some one had. previously tried to shoot defendant and the cartridge was found not to contain any powder.

The trial court submitted the case to the jury on murder in the first and second degrees and upon self-defense. Although defendant asked an instruction on manslaughter and excepted to its refusal, no complaint is made in the motion for a new trial that the court failed to instruct on all the law of the case.

I. There are three assignments of error in the motion for a new trial, which we are unable to consider for the reason that there is nothing in the record upon which to base a review. Error is assigned because the trial court overruled defendant's application for continuance, his plea in abatement and his motion to quash the information. None of these motions has been included in the record before us. If any evidence was offered on the plea in abatement, the bill of exceptions does not so show. There is, therefore, nothing before us for consideration on these three assignments.

*Insufficient Record.*

II. Appellant complains that the trial court admitted incompetent evidence offered by the State over his objection. A careful reading of the record does not disclose a single objection to any of the testimony of the State as it was offered. We would be justified in disposing of the assignment adversely to defendant for this reason. The record discloses two instances where defendant moved to strike out testimony and complaints of error in that regard. In the first instance the court struck out certain alleged statements, made by defendant after the killing, which related to matters not connected with the. offense charged, and refused to strike out the remainder. Of the action of the court in failing to strike out all the testimony, defendant complains. The matter not stricken

*Striking Out Testimony.*

out related to statements made by defendant in reference to killing Hoover and was clearly proper.

The second instance was one which we cannot now consider. Defendant did not make timely objection to the question, which clearly indicated the character of the answer sought and stated no specific ground for striking out the testimony to which he objected. One seeking to strike out testimony must assign some specific reason why it should be stricken out. A general objection in a motion to strike out testimony already given is just as insufficient as it is to prevent its introduction in the first instance. [38 Cyc. 1405; Michaels v. Harvey, 195 S. W. (Mo. App.) l. c. 520; Lilly v. K. C. Rys., 209 S. W. (Mo. App.) l. c. 972.]

III. It is contended that the trial court erred in permitting counsel for the State to indulge in improper Argument and prejudicial argument to the jury. The to Jury. record discloses the following:

"L. B. Shuck, Assistant Prosecutor, in his closing argument to the jury, stated that 'I don't know how long ago, but nearly one hundred years ago our laws were made to inflict the death penalty for murder in the first degree, but some three years ago, I think it was three years ago March 4th, the Legislature of the State of Missouri abolished capital punishment, it had come to the point that civilization had reached the point where it was unnecessary to have capital punishment, and they abolished that law'—(interrupted here). Counsel for the defendant here objects to the attorney telling about what the law was and we ask that be withdrawn from the jury, which objection was by the court overruled, to which ruling of the court defendant then and there in open court excepted.

"Counsel for the State, L. B. Shuck, in his closing argument stated to the jury, 'and when you are called to the bar of justice, where all are called, and there with Jack Hoover you can say to him, Jack you wasn't

in Shannon County when we tried that case, but we as twelve honest men represented you.'

"Defendant objects to that and asks that it be withdrawn, that they represented the deceased. Which objection was by the court overruled, to which ruling the defendant did then and there in open court duly except."

The defendant could not have been prejudiced by the remarks covered by the first objection, even though the remarks were improper, which we do not need to consider. It is hard to see how the defendant on trial for a killing of the most brutal nature could be hurt by counsel for the State telling the jury capital punishment had been abolished by the Legislature at one time. The statement was at least historically correct. Since the evidence of the State tended to show that defendant was guilty of a crime for which the death penalty would not have been undeserved, counsel was clearly within his rights in arguing for its infliction, if the language objected to was part of his argument for such punishment.

Defendant asked that the statement that the jury represented the deceased, made in the second part of the argument objected to, be withdrawn and complains of error in the refusal of this request. Of course, it is true as a matter of fact and of law that the jurors did not represent the deceased. They were sitting as impartial triers of the facts as contended for by the State and the defendant. They had taken an oath well and truly to try the matters in difference between the State and the defendant and a true verdict render according to the law and the evidence, and they no doubt fully understood their exact status and their duty as jurors. They doubtless understood the argument as it appeals to us, as perfervid oratory of ardent counsel. The remark was not calculated to arouse sympathy or prejudice greater than the facts in evidence tended to create. The argument if improper, was of little importance and refusal to strike it out is not reversible error. [16 C.

J. 909.] We are unable to see how the defendant could possibly have been prejudiced by such an argument.

IV.  The only remaining assignment is that the court erred in giving each and every one of the instructions from one to seventeen, inclusive, and particularly instruction seventeen.

*Instructions.*

The first seven instructions tell the jury the respective provinces of the court as to the law of the case and of the jury as to the facts of the case under the law as declared by the court, and define murder in the first degree as the wilful, deliberate, premeditated and malicious killing of a human being, and define each of those terms.  No possible criticism can be made of said instructions.

Instruction eight was the chief instruction telling the jury if they found certain facts to convict defendant of murder in the first degree and defining the appropriate punishment.  It follows approved precedents and need not be quoted.

Instructions nine and ten told the jury that if they found defendant not guilty of murder in the first degree, they should consider whether he was guilty of murder in the second degree, and correctly defined murder in that degree.

Instruction eleven properly outlined the facts necessary to be found to convict defendant of murder in the second degree, and defined the limits of punishment. It also is in approved form.

Instructions twelve, thirteen and fourteen correctly set out the law as to the effect of the filing of the information, presumption of defendant's innocence, define reasonable doubt and told the jury that the State must establish defendant's guilt beyond such reasonable doubt; define the rules governing the weight and credit to be given by the jury to the testimony of the various witnesses.  No just criticism can be made of any of these instructions.

Instruction fifteen covered the subject of the effect of the testimony of threats made by deceased against defendant, whether communicated to defendant or not, in determining who was the aggressor in the fatal encounter. The instruction was as favorable to defendant as he was entitled to.

Instruction sixteen covered the law relating to self-defense and fully stated the law on that subject, including the right of defendant to act on appearances and that the danger need not be real or about to fall, but only that defendant had reasonable cause to believe and did believe such facts. We find no fault with the instruction.

Instruction seventeen is the one concerning which defendant particularly complains and it reads as follows:

"The court instructs the jury that before you can acquit the defendant on the ground of self-defense, you should find and believe from the evidence that the defendant had reasonable cause to believe or apprehend and did believe or apprehend that Jack Hoover was about to inflict upon him some great personal injury or bodily harm, and that such danger was imminent and impending, *and unless you so believe you should find the defendant guilty and assess his punishment as provided in these instructions.*"

Self-Defense:
Guilty Without
Finding of Facts.

The criticism of this instruction is doubtless leveled against the words we have italicized. Considered without regard to the state of the record, this instruction is erroneous in directing a verdict of conviction of murder in the first or second degree without requiring a finding of all the facts necessary to such conviction. If defendant had denied his presence at or participation in the killing and the evidence of self-defense had been developed from witnesses other than defendant, or if he had not taken the witness stand and admitted the killing, we would be compelled to say the giving of this instruction constituted reversible error.

But defendant took the witness stand in his own behalf and solemnly admitted the killing of deceased. The killing under all the evidence was either murder in one of the degrees or was justifiable on the ground of self-defense. Instruction seventeen eliminated justification unless the jury found the killing was done by defendant under reasonable apprehension of great personal injury or bodily harm to himself at the hands of the deceased. If the jury failed so to find, then the only remaining alternative was guilt of murder and assessment of punishment in accordance with the instructions on first and second degree murder. There were no pleas of accident, insanity or other defenses to confuse the issue. Defendant admitted the killing. It was done either in self-defense or it was murder. The giving of the instruction in this form must therefore be held not to be reversible error under the particular state of the record with which we are dealing.

V. The foregoing observations dispose of all the assignments of error we have been able to discover in the record, unaided as we have been by brief of counsel. In addition to the assignments made in the motion for new trial, we have examined the record proper and find no error therein.

The judgment is affirmed. All concur.