THE STATE v. ANGIE SAALE, Appellant.

Division Two, June 5, 1925.

1. **PUBLIC TRIAL:** Crowded Court Room. The publicity of a trial guaranteed by both the Federal and State Constitutions must be subordinated to reason; and where the public are admitted until all the seats in the court-room are filled, it cannot be ruled that the defendant is denied a fair public trial, although, in the interest of safety, the court orders the doors locked to keep persons desiring to enter from crowding over those already within.

2. **EVIDENCE:** General Objection: Corroborative Circumstance. An objection that certain proffered testimony is immaterial and irrelevant is sufficient to preserve an exception to its admission where it is inadmissible for any purpose, but not where it is admissible as a corroborative and incriminating circumstance.

3. ————: Incriminating Circumstance: Conspiracy. Where defendant's paramour has testified that in the afternoon preceding the assault she handed him a pistol with a request that he take it and kill her husband, and that he handed it back to her and told her he didn't want it, it is not error to permit a witness to testify that the pistol handed him by counsel was the one given him by defendant soon

after her husband had been assaulted by the paramour with a club. Although this part of the conspiracy shown did not constitute the substantive crime, the testimony, along with other relevant facts and circumstances, was admissible as corroborative of the testimony of the defendant's paramour, to show not only that she had the pistol in her possession at the time of the assault, but her purpose in having it, and as an incriminating circumstance tending to show her guilty participation in the subsequent assault with a club.

4. **CONFESSION: No Coercion: Voluntary.** If no fear, force or coercion was present as an inducing cause the confession of guilt made by defendant is presumed to be voluntary, and is admissible in evidence against her.

Citations to Headnotes: Headnote 1: Criminal Law, 16 C. J. sec. 2052. Headnote 2: Criminal Law, 16 C. J. sec. 2200. Headnote 3: Criminal Law, 16 C. J. sec. 1047. Headnote 4: Criminal Law, 16 C. J. sec. 1509.

Appeal from St. Charles Circuit Court.—*Hon. Edgar B. Woolfolk*, Judge.

AFFIRMED.

*Rufus L. Higginbotham* for appellant.

(1) The accused was entitled to a fair and public trial. Sec. 22, Art. 2, Missouri Constitution; State v. Brooks, 92 Mo. 542. (2) All evidence introduced shall be relevant to the guilt or innocence of the accused. This rule is applied with considerable strictness in criminal proceedings. And the evidence offered by the prosecution should consist wholly of fact within the range and scope of the allegations in the information. Underhill on Criminal Evidence (2 Ed.) p. 178, sec. 97; State v. Moberly, 121 Mo. 604. (3) If the promise or threats were made by or in the presence of one in authority, or having control over the prisoner, and were such as might influence the prisoner, it is presumed that the confession afterwards made was induced by such threats and promises. State v. Jones, 171 Mo. 401. (a) If threats or promises, however slight, are used to induce

confession, it is not admissible. State v. Brooks, 220 Mo. 74. (b) A confession procured by the statement, "You had better tell me all you know," was held inadmissible. Kelley's Criminal Law & Practice (3 Ed.) p. 234, sec. 283. (c) The confession alleged to have been procured in this case, being procured by such statements of Deputy Sheriff John Grothe, immediately after he arrested defendant and while she was in his charge and custody, and upon his making such statements as these to her: "Ora Thoele told us all about this" and "You just as well come on and tell us your part of it" and "It would be better for you to tell about it" and "I am an officer and it would be better for you to tell me about it" and "I know all about it any way" and "You just as well come across and tell all about it" was not a free and voluntary statement, and those statements made the confession inadmissible. State v. Jones, 171 Mo. 401; State v. Brooks, 220 Mo. 74; Kelley's Criminal Law & Practice (3 Ed.) p. 234, sec. 283.

*Robert W. Otto,* Attorney-General, and *J. Henry Caruthers,* Assistant Attorney-General, for respondent.

(1) Appellant complains that she was not accorded a fair public trial. This point is not well founded, since the record shows that all the seats and standing room in the court house were occupied with people. (2) The question of whether or not the confession of appellant was voluntary was properly submitted to the jury, and the jury found as a fact that it was voluntary. State v. Jones, 171 Mo. 405; State v. Brooks, 220 Mo. 83.

WALKER, P. J.—The appellant was charged by information in the Circuit Court of St. Charles County with an assault with intent to kill, and upon a trial was convicted and sentenced to fifteen years' imprisonment in the penitentiary. From that judgment she appeals.

Peter Saale, the husband of the appellant, was the victim of the assault. He and his wife lived on a farm in

St. Charles County. Joseph Saale, the brother of Peter, lived alone in a house about five hundred feet from that occupied by Peter and his family, consisting of the appellant and their five children. Some time after eight o'clock on the night of January 30, 1924, Joseph heard some one moaning at Peter's house. Upon look-out he saw a light in one of Peter's windows and started over there, but the light was extinguished as he approached the house. Upon reaching the house he opened the door and saw the appellant sitting in the room alone. He asked her where Peter was, and she said he was down at the barn or the horse lot. The moaning continued and Joseph went out to ascertain from whence it came. He followed the sounds until he came to a well or cistern, and looking down into it he saw his brother Peter therein and found that the moans emanated from him. The well had two buckets, one at each end of a chain which ran over a pulley suspended from a supporting frame. These buckets had been pulled up out of the well and placed on each side of the rim or outer edge of the same. Joseph let down one of the buckets into the well and told Peter to take hold of the chain and he would draw him up. Peter hesitated to comply until he was assured that it was his brother who was offering to help him. He then took hold of the chain, and Joseph drew him up out of the well, carried him to his residence, put him to bed and summoned a physician, who, upon examining him, found contused wounds or bruises on his head, neck and shoulders. He finally recovered from his injuries.

A neighbor of the Saales, named Ora Thoele, who has been convicted as a participant in this crime and is now undergoing punishment for same, testified at appellant's trial that for some time before the assault he had been criminally intimate with the appellant; that she suggested at different times that they "do away with her husband;" that at their last meeting, the afternoon preceding the crime, she reached down in a buggy in which they were sitting, took up a pistol, handed it to the

witness and told him to take it and kill her husband that night. He declined to take the weapon, and upon leaving her she insisted upon his coming to her home that night, and he consented to do so. He went there at about eight o'clock. She saw him approaching and motioned to him not to come in. About ten minutes thereafter she came out and insisted upon his doing away with her husband that night. He told her he would do the best he could. She suggested that he take a stick and hit him over the head, and then went back into the house. She came out twice thereafter to see if he was still there. The last time she came out she again told the witness to get a stick and she would tell Pete, her husband, to go to the barn, that something was wrong down there. Witness found a heavy stick, two and a half or three feet long and one or one and a half inches thick. He picked it up and went upon the porch and stood near the door. After he had been there a few minutes Peter came out, evidently to go to the barn at his wife's suggestion. Just as he was about to step off of the porch the witness took the club in both hands and struck him one or two blows over the head. He crumpled up or fell in a heap, with his face downward and the lower part of his body on the porch. The blows rendered him unconscious. Just as the witness struck Peter, the latter's wife, the appellant, came out of the door and said, "Let's put him down in the well." Witness and the appellant then carried Peter twenty-five or thirty feet to the well and threw him into it head foremost.

The doctor called to attend Peter the night his brother took him out of the well, stated that he found him unconscious and suffering profound shock, caused by bruises upon his head, neck and shoulders. He visited him daily during the succeeding week or ten days, much of which time he was in a semi-conscious condition, the blows he had received resulting in a concussion of the brain. That his sudden immersion in cold water, after having been rendered unconscious from the blows,

probably produced a shock which caused him to regain consciousness sufficient to enable him to make the moans his brother had heard.

A witness named Groethe, one of the deputy sheriffs of St. Charles County, testified to a conversation he had with the appellant at the court house in the city of St. Charles some time in February succeeding the assault. After some preliminary conversation the witness asked the appellant to tell him about her husband being in the well; that she might as well tell the truth about it, that Thoele had told who helped him. Whereupon she said: "Did Mr. Thoele say I helped to throw my husband in the well? Well, I didn't do it by myself?" She then proceeded to relate the circumstances under which the crime was committed. Her statement is in effect as follows: That she and Thoele plotted the crime on the porch of a neighbor, named Evans, the day of its commission; that she went home and about eight o'clock that night she went out of the house and saw Thoele standing near. She told him not to leave. She went out a second time and seeing Thoele still there again told him not to leave; that she went back into the house, and told her husband there was some trouble at the barn and that he had better go and see about the horses. That her husband started out and as he was about to step off of the porch Thoele struck him. She went and helped Thoele carry her husband to the well; that they took the buckets out, set them on either side of the well and threw her husband into it; that the taking of the buckets out of the well was to prevent her husband, if he came to, from catching hold of the chain to keep from drowning. She then went over to a clothes line and took a pole used for its support and gave it to Thoele to push her husband's body under the water and drown him if he was not dead. This witness then identified a long pole and a short heavy stick which appellant, in her statement to him, said were the ones that were used by Thoele as she had directed.

The testimony for the appellant was to this effect: that some time prior to the assault she was driving a horse hitched to a buggy towards St. Charles, and the horse ran away and she received injuries. to her head and was taken to a hospital for treatment.

A doctor then testified that for several years prior to the assault he had treated the appellant profession-ally, and had seen her off-and-on since the date of that offense; that a recent examination had disclosed that she had a toxic goitre which causes nervousness, in-creased rapidity of heart action and a feeling of appre-hension which might have affected her mind, but that so far as he could tell her mental condition was other-wise sound and that she was possessed of average in-telligence.

Peter Saale, her husband, testified that he and his wife sat and read for some time after supper the night of the assault. That he noticed that she went out of the house twice during the evening. He heard her talking to no one while out; that she did not suggest that he go out to look after the stock and he could not say what happened to him the night he was injured.

The appellant testified as to her age, the number of her children, her attendance at school in her girlhood; that she did not see Thoele the night of the assault or ask him to hit her husband.

A daughter of these people, nine years old, testified that she once took a note from her mother to Thoele, and that on the night her father was hurt her mother went out of the house three times.

I. Counsel for appellant contend that she was not given "a fair, public trial." This complaint is based upon the charge that at times during the trial the doors of the court room were locked, and that the pub-lic or persons who sought admission were at such times excluded. The facts are as follows: When the case was called for trial the court room was crowded with people and the judge asked the sheriff if

Public
Trial.

the seating and standing room was all occupied. The latter answered in the affirmative. The judge then inquired if the court room door was locked. To which the sheriff answered, "No, sir, not right at present." "If it is necessary," said the judge, "You may lock the door to keep persons from crowding over each other. Somebody might get crippled."

In the further progress of the trial the judge directed the sheriff, when the room became crowded, to lock the door to prevent further attempted admissions. The reason therefor is found in the judge's statement that "the room was as full as it could be." The right of a public trial to one accused of crime is accorded both by the Federal and the State constitutions. [Sixth Amdt. U. S. Const.; Sec. 22, Art. 2, Const. Mo.] The origin of this guaranty is closely linked with the history of human liberty. Perhaps, although this is problematical, this right had its genesis in a revulsion in the Anglo-Saxon mind against the iniquities of the Star Chamber proceedings. Be this as it may, the publicity enjoined by organic laws must, in the administration of justice, be subordinated to reason. It has not only been held here but elsewhere that it is within the discretion of the court to exclude the general public from the court where it is found necessary in order to secure the proper administration of justice and to facilitate the orderly conduct of the trial.

In State v. Brooks, 92 Mo. l. c. 573, while it appears that the court made no order excluding the public, the court holds, in sententious phrase, that the right of a defendant in a criminal case to a public trial is not violated, where, after admitting the public until the seats of the court room were filled, others seeking admission are excluded. In further discussion of the wisdom of the rule as thus announced, the court quotes with approval the conclusions in regard thereto of the leading treatises in this country on Constitutional Limitations and Criminal Procedure as follows:

"Publicity does not absolutely forbid all temporary shutting of doors, or render incompetent a witness who cannot be heard by the largest audience, or require a court-room of dimensions adequate to the accommodation of all desirious of attending a notorious trial. . . . 'And the requirement is fairly met if, without partiality or favoritism, a reasonable proportion of the public is suffered to attend, notwithstanding that those whose presence would be of no service to the accused, and who would only be drawn thither by a prurient curiosity, are excluded altogether.' " [Cooley Const. Lim., top p. 380, side p. 312; Bish. Crim. Proc., sec. 859.]

This opinion need not be burdened with citations from other jurisdictions on this question. The curious will find them numerously appended as notes to Sec. 2052, 16 C. J. pp. 807 and 808. We overrule this contention.

II. It is contended that error was committed in permitting counsel for the State to show by a witness that a pistol handed to the witness by counsel was the one given to him by the appellant soon after her husband had been taken from the well. The gist of the objections to the State's identification of the weapon is its immateriality and irrelevancy.

*Incriminating Circumstance: Conspiracy: Insufficient Objection.*

An objection to testimony based on these reasons we have repeatedly held is not a sufficient challenge to the State's inquiry to merit our consideration. [Heinbach v. Heinbach, 274 Mo. 301; State v. Lassieur, 242 S. W. (Mo.) 900; State v. Delcour, 297 Mo. 321.]

It is true, as held in State v. Barker, 249 S. W. (Mo.) l. c. 77, if the testimony objected to is not admissible for any purpose, a general objection, such as is here made, will be sufficient to preserve an exception to its admissibility. The purpose of the State in the introduction of this testimony becomes evident when read in connection with the testimony of appellant's paramour, who stated on his direct examination that the afternoon of the day

of the assault he and the appellant met and that she reached down in the buggy in which they were sitting, took out a pistol, handed it to the witness and wanted him to take it "and kill her old man with it that night." He handed it back to her and told her he didn't want it. The weapon referred to was the one identified at the trial to which counsel for the defense interposed the general objection to the admission of the testimony in regard thereto. If it be conceded that the objection was sufficient to preserve the exception for review, the witness testifying to this identification was detailing the facts as to the conduct of the appellant on the night of the crime. These being the circumstances under which the testimony was introduced it was admissible as corroborative, along with other relevant facts and circumstances in evidence, of the testimony of the appellant's paramour, who was her accomplice, to show not only that she had in her possession the night of the crime the pistol in question, but her purpose in having the same. Therefore, although the crime was not committed with this weapon, it was nevertheless proper to admit the testimony objected to as an incriminating circumstance tending to show her guilt of the crime charged. [Holmes v. State, 70 Tex. Crim. Rep. 214, 156 S. W. 1172; State v. Craemer, 12 Wash. 217; Andrews v. State, 159 Ala. 14, 48 So. 858.]

While the conspiracy shown did not constitute the substantive crime, it was a material incident in its commission and greater latitude is permissible in the admission of evidence which may tend to sustain the principal fact in issue, viz., the appellant's participation in the crime, than under other circumstances. The testimony of the appellant's accomplice, therefore, as to her possession of the pistol and her expressed desire that he use it in the commission of the crime, and the identification of the pistol before the jury, was admissible under the rule above stated. [State v. Shaffer, 253 Mo. 320; State v. Smalley, 252 S. W. (Mo.) 443; State v.

Sassaman, 214 Mo. 695; State v. McNamara, 212 Mo. 150.]

III.  It is contended that error was committed in the admission in evidence of the confession made by the appellant.  There were no threats or promises made by the deputy sheriff to the appellant to coerce or induce her to admit her guilt.  The presence of fear, or force or duress must be shown to render a statement of the character here under review, inadmissible.  [State v. Lee, 288 Mo. 41; State v. Hart, 237 S. W. (Mo.) 473; State v. Meyer, 293 Mo. 108; State v. McNeal, 237 S. W. (Mo.) 738.]  In the absence, as in this case, of any evidence to the contrary, the statements of the appellant concerning her guilt will be presumed to have been voluntarily made.  [State v. Johnson, 252 S. W. (Mo.) 623.]  This contention is therefore overruled.

*Confession.*

IV.  This was a brutal crime.  Its purpose was murder.  That it did not thus culminate is due to no act of intervention of the appellant.  Only the fortunate proximity of the brother of the victim and his timely aid thwarted the purpose of the appellant and her paramour.  So utterly lacking is this case in any feature which might be employed to arouse human sympathy that no effort was made by the defense to introduce any extenuating fact or circumstance during the progress of the trial.  The defense interposed consisted solely of technical objections to the court's rulings and the conduct of the representative of the State.  We find no substantial merit in any of these objections.  The case was fairly tried and the appellant was denied no right to which she was entitled under the law.  The judgment of the trial court is affirmed.  All concur.