STATE, Respondent, v. DAMM, Appellant.

(252 N. W. 7.)

(File No. 7390. Opinion filed December 29, 1933.)

*Louis H. Smith,* of Sioux Falls, and *Diamond & Jory,* of Sheldon, Iowa, for Appellant.

*M. Q. Sharpe,* Attorney General, *R. F. Drewry,* Assistant Attorney general, and *G. Norton Jameson,* State's Attorney, of Sioux Falls, for the State.

CAMPBELL, J. Defendant, Clement Damm, and his wife intermarried in 1913. No children have been born of said marriage, but in 1925, while residing in Iowa, Damm and his wife adopted twin girls, Ruby and Ruth Wilson, then approximately seven years of age. The family removed to Sioux Falls, S. D., in April, 1929, where they continued to reside. In May, 1931, it was discovered that Ruby, one of the adopted girls, was pregnant, and shortly thereafter defendant was arrested upon a charge of second degree rape. Ruby gave birth to a normal, full-term, female child on September 25, 1931. Shortly thereafter defendant was brought to trial and was convicted and sentenced to imprisonment for a term of sixteen years, from which judgment and from a denial of his application for new trial he has appealed to this court.

Appellant's brief predicates error upon seventy-two assignments treated in twelve separate groups. Under group 1 are set forth seven separate assignments going to the proposition that error was committed by permitting the state to address leading questions to the prosecutrix. In group 2 are nine assignments claiming error by reason of undue restriction of appellant's cross-examination of the prosecutrix. In group 3 are nineteen assignments, all dealing with claimed error in the rulings of the trial court with reference to admission or rejection of evidence. In group 5 are six assignments claiming error of the trial court in its rulings with reference to the admission of offered exhibits. The twelfth and last group

contains one assignment of error going to the proposition that the sentence was cruel and excessive within the prohibition of section 23, art. 6, Constitution South Dakota, and the Eighth Amendment to the Constitution of the United States.

■ With reference to the above-mentioned groups 1, 2, 3, 5, and 12, the brief sets forth fully each assignment of error therein embraced, but none of such assignments are discussed or argued in the brief, and they are therefore deemed abandoned. Dowdle v. Cornue (1896) 9 S. D. 126, 68 N. W. 194; Nordin v. Berner (1902) 15 S. D. 611, 91 N. W. 308; Scott v. Gage (1902) 16 S. D. 285, 92 N. W. 37; Edgemont Imp. Co. v. Tubbs Sheep Co. (1908) 22 S. D. 142, 115 N. W. 1130; Nichols & Shepard Co. v. Marshall (1911) 28 S. D. 182, 132 N. W. 791; Redford v. Weller (1911) 27 S. D. 334, 131 N. W. 296; Lunden v. Ry. Co. (1913) 31 S. D. 357, 141 N. W. 93; Bridenbaugh v. McElrath (1915) 35 S. D. 307, 152 N. W. 113; John Morrell & Co. v. Am. Express Co. (1922) 45 S. D. 399, 187 N. W. 724; Loveland v. Perriton (1928) 53 S. D. 372, 220 N. W. 874.

■ We come now to the errors assigned by the appellant under group 4, which is captioned in the brief as follows: "The Court Erred in Admitting Prejudicial and Impeaching Evidence Upon a Collateral Matter." So much of the situation as is essential to intelligent treatment of the errors assigned under this group may be stated as follows: Prior to appellant's arrest on Monday, May 18, 1931, he had been employed for some little time by Minnehaha county, and for ten or more days prior to his arrest (excluding Sundays and possibly some days of inclement weather) he had been engaged in working for the county upon a highway construction project near Garretson, about thirty minutes drive from his home by automobile. It appeared from the testimony of the prosecutrix as part of the case in chief on behalf of the state that she had no knowledge of her pregnancy until either Wednesday or Thursday, the 13th or 14th of May, 1931, when she, together with her mother and an acquaintance of the family, Mrs. Fred Myers, visited a physician who ascertained the fact of pregnancy and informed prosecutrix and her mother thereof. Prosecutrix testified that on this day after the visit to the physician she informed her mother for the first time of the relations which appellant had maintained with her; that in the late afternoon or evening

of that same day her mother caused a telephone message to be transmitted to appellant where he was working near Garretson; as a result of which he came home that evening; that he returned to his work early the next morning, but again came home Saturday afternoon or evening, May 16, remaining over Sunday; that Saturday evening the entire family drove down town shopping, and that the mother went into a grocery store leaving appellant and the two girls in the automobile, at which time appellant said to prosecutrix, in substance, "I thought I told you not to tell."

After the close of the state's case, appellant took the witness stand. He denied any and all improper intimacy with the prosecutrix, and denied that he was ever called home from Garretson excepting upon one occasion; to wit, on the afternoon of Monday, May 18, the day of his arrest. Appellant testified that about 3:30 on that day the foreman of the work where he was employed came to him and said that a telephone message had just been received asking him to return home because of his daughter's illness; that he immediately got in his automobile and drove home, and, entering the house, found his wife and the two girls there. He made some inquiry as to why he had been summoned, and just at that moment the police car drove up and he was taken into custody by officers and removed to jail. He testified that he had no remote idea of why he was arrested or what the difficulty was about, and did not even know of the pregnancy of prosecutrix until subsequently to his arrest, when he was taken into municipal court for preliminary examination. He denied any such conversation with the prosecutrix as she testified to having occurred on the Saturday evening prior to his arrest, although admitting that he was home that Saturday evening and the following Sunday. On cross-examination counsel for the state interrogated appellant at length with reference to whether or not he had received a telephone message from one Fred Myers, Wednesday or Thursday evening preceding his arrest, requesting him to come home at once. Fred Myers was a friend and former neighbor of the family and the husband of the Mrs. Myers who had accompanied prosecutrix and her mother to the physician's office on the occasion when they learned of her pregnancy. Appellant steadfastly denied any such conversation, and insisted that the only telephone message he ever received or had knowledge of at Garretson was the call of which he was ad-

vised by the superintendent on Monday, the 18th, as a result of which he came home and was immediately arrested.

In rebuttal, the state, over the objection of appellant, was permitted to show by Fred Myers and his wife and by operators and records of the telephone company that Myers placed a telephone call from his residence phone for the appellant at a certain farm near Garretson, where the county workmen were headquartered, about 6:30 on the evening of May 13, and that the parties were in telephonic communication for thirty-two seconds according to the records of the telephone company. Myers was permitted to testify that at that time (being the early evening of the day his wife had accompanied prosecutrix and her mother to the physician's office) he talked to the appellant over the telephone, calling him by name, and asked him if he could come home at once, and further testifying that, when appellant inquired why his presence was desired, he (Myers) said, "It is about Ruby, Clem," whereupon appellant replied he would come at once. Mrs. Myers was permitted to testify as to the placing of the telephone call, and that she went to the residence of appellant that same evening and there waited until he arrived shortly before 8 o'clock. It is this testimony thus introduced in rebuttal by the state which appellant claims was improperly received as being impeachment upon a collateral matter. Under all the circumstances here appearing, we do not think the evidence falls within the rule invoked. There is no question in this case as to the pregnancy and subsequent delivery of the prosecutrix. Neither is it questioned that the fact of the pregnancy was ascertained by visiting a physician on May 13 or 14. It was the position of appellant that he was falsely accused by prosecutrix, probably with the connivance or at the instigation of her mother, and perhaps to shield some one else; and that he knew nothing whatever of the pregnancy, the fact of which had been learned by the family on the 13th or 14th, until he heard of it in court on May 20 after his arrest without even being advised or having any possible suspicion of the charge against him. Under the circumstances, and in view of this position of the defense, we are not disposed to hold that evidence offered to show that the family caused appellant to be communicated with and sent for immediately or very shortly after learning the fact of the pregnancy was evidence directed to a collateral issue. We find no prejudicial error in the assignments under this group.

■ Under group 6 appellant sets forth certain claims of error residing in the failure of the court to give instructions requested by the appellant, being requested instructions 2, 3, 4, 6, and 7. To set out each request at length would not be helpful. We have examined the record in this regard with care. The instructions were full, fair, and complete, and everything to which the appellant was entitled in the requested instructions was, in our opinion, fully, fairly, and completely covered in the instructions as actually given by the court. The phraseology of the instructions given was not in all respects identical with the precise language of the requests, but the real essence of everything in the requests is embraced, in the instructions given in clear and intelligible language, and we find no prejudicial error here.

■■ The seventh group of errors relied upon by appellant embraces five separate assignments going to the proposition that the state's attorney was guilty of prejudicial misconduct. We have carefully examined each separate assignment in this group. Four of them are entirely lacking in merit, and no good purpose would be accomplished by stating or discussing them in this opinion. The fifth assignment in this group (assignment number Thirty-nine in the record) is predicated upon the following situation: As part of its case in chief, the state called as a witness Anna M. Damm, wife of the appellant. After being sworn, she stated, in response to two questions by counsel for the state, that her name was Anna M. Damm and that she was the wife of appellant. Immediately following the reply of the witness to the second question, counsel for appellant started very apparently to object to further testimony by this witness. Counsel for appellant had barely started to make his objection when he was interrupted by counsel for the state, who said, "At this time, may it please the court, the state asks permission of the defendant to place his wife on the stand to testify." Appellant urges that such request so made (and it was in the presence of the jury) was highly prejudicial and improper, and was made solely to emphasize before the jury the fact of appellant's unwillingness to have his wife testify. It is the law of this state (subdivision 1, § 2717, Rev. Code 1919, as amended by chapter 412, Laws 1921) that a wife cannot be examined for or against her husband in a criminal case without his consent, with certain exceptions. The instant case does not fall within the statutory excep-

tion permitting such testimony in a criminal action or proceeding "for a crime committed by one against the other." State v. Burt (1903) 17 S. D. 7, 94 N. W. 409, 410, 62 L. R. A. 172, 106 Am. St. Rep. 759. It is the general rule, however, as stated by Professor Wigmore (Wigmore on Evidence [2d. Ed.] § 2243) that "the party desiring to compel the spouse to testify may at least call for the testimony, and is not to be deprived of it until the party-spouse formally objects and claims the privilege." Cf. also Commonwealth v. Weber (1895) 167 Pa. 153, 31 A. 481; State v. Roby (1915) 128 Minn. 187, 150 N. W. 793, Ann Cas. 1915 D, 360; State v. Virgens (1915) 128 Minn. 422, 151 N. W. 190. It seems quite plain in this case that, if counsel for appellant had been permitted to finish his objection (which was being made in the presence of the jury and which would necessarily have been based on the ground that the wife was not a competent witness against appellant without his consent), and the court had sustained such objection, as, of course, it would have done, no prejudice could well be urged, although it would have been entirely apparent to the jury that the state was desirous of having the wife testify, and that her testimony was excluded because appellant was availing himself of his statutory right and was unwilling to have such testimony admitted. We do not commend the practice of calling the husband or wife of a party defendant to the stand and in the presence of the jury asking consent to their testimony, and in this case it would have been better had the matter been otherwise handled. We do not believe, however, that prejudicial error was committed or that we would be justified in reversing this case upon this ground. The state being entitled to call the wife and proceed with her examination until the objection by the appellant, so far as concerns the matter of prejudice we can find no particular distinction between calling the witness and requesting the consent of the appellant to her examination and calling the witness and proceeding with her examination until appellant asserted his non-consent.

The eighth group of assignments predicates error upon exclusion of the audience during the examination of the prosecuting witness. The facts in this connection appear to be about as follows: The state, as its first witness, had called the prosecutrix, Ruby Damm. After her interrogation by the state had proceeded for some time, the witness commenced to cry, and it was apparent

that she was embarrassed and emotionally disturbed. Thereupon the court, on motion of the state's attorney, required all the audience to leave the courtroom during the remainder of the testimony of prosecutrix. Counsel, of course were permitted to remain, likewise the officers of the court, and apparently a newspaper representative. Appellant complains that by this exclusion of the audience during the testimony of prosecutrix he was deprived of that public trial contemplated by section 7, art. 6, Constitution of South Dakota. How far, for how long, and to what extent the public may be excluded from the trial of a criminal case without infringing upon the constitutional right of the defendant is a matter of some conflict in the authorities. Cf. Cooley's Constitutional Limitations (8th Ed.) p. 647; State v. Callahan (1907) 100 Minn. 63, 110 N. W. 342; Reagan v. United States (1913) 202 F. 488, 120 C. C. A. 627, 44 L. R. A. (N. S.) 583; Moore v. State (1921) 151 Ga. 648, 108 S. E. 47; State v. Saale (1925) 308 Mo. 573, 274 S. W. 393; State v. Bonza (1928) 72 Utah, 177, 269 P. 480. In the instant case, it is to be observed that appellant made no request to have any specific person or persons of his friends or relatives exempted from the effect of the exclusion order. The order was effective only during the testimony of the prosecutrix. In view of the nature of the case and the age of the prosecutrix, her embarrassment and disturbance are readily understandable. Under all the circumstances here appearing, we do not think the court abused its discretion or committed prejudicial error by its ruling, or deprived the appellant of a public trial within the meaning of the constitutional provision.

The ninth group of errors assigned deals with a matter that appears to be one of first impression in the courts of this country. A medical expert called by appellant testified concerning the matter of proof of paternity by blood test. It was not the contention of this witness that paternity could in any case be affirmatively proved by such blood test, but he did contend that in quite a percentage of cases the impossibility of claimed paternity could be demonstrated by blood test. It was, in substance, the testimony of this witness that human blood is divided into four recognized types or groups, and that, if the blood groups of both parents are known, the blood group of the offspring can, to a certain extent be predicted. Conversely, if the blood groups of a

mother and child are known, it can be said what must have been the blood group of the father, and consequently the impossibility of certain paternity may be effectively demonstrated. Appellant in this case offered to submit himself to such blood test, and asked the court to require prosecutrix and her infant child to submit thereto. The blood test itself is a laboratory procedure, and requires but a drop or two of blood, which can be taken from the subject without pain or danger. The court denied the request of appellant, and he predicates error thereon. Of course, appellant himself could not say at the time of making the request what might be thereby developed had the request been granted, but he claims that he was deprived of the opportunity to make an experiment that might possibly have demonstrated his innocence beyond question. To illustrate appellant's contention, it was the claim of appellant's expert that, if the blood of the father and the blood of the mother are both of group 1, the blood of the offspring must necessarily be of group 1. Therefore, if it might have appeared as a result of the test that the blood of prosecutrix and the blood of appellant were both in group 1, but the blood of the child was in either group 2 or group 3 or group 4, then the impossibility of appellant's paternity would thereby be demonstrated. The error claimed on this point raises several somewhat novel and interesting questions. On the power of a court to order physical examination and as to when refusal so to do amounts to abuse of discretion, see note, 15 L. R. A. (N. S.) 663; see Wigmore on Evidence (2d Ed.) §§ 2194, 2216, 2220; cf. also 20 Mich. Law Rev. 451. More precisely on the point is a very interesting article by Mr. Blewett Lee, "Blood Tests for Paternity," 12 Am. Bar Ass'n Journal, 441 (1926), and see the case there cited Hayt v. Brewster, Gordon & Co. (1921) 199 App. Div. 68, 191 N. Y. S. 176.

It appears that evidence as to blood tests in paternity cases has been accepted in Continental countries. We can find no record of the question being passed upon by any courts of last resort in the United States. We are led to believe that such testimony was admitted before a county court in New Haven, Conn., in January of this year in a bastardy case, but it appears that subsequently the charge was withdrawn by the complainant, so the question of admissibility of this evidence did not come before any higher court, and apparently was not the subject of a written opinion. See

"Time," issue of January 30, 1933, p. 43. A comment on the subject in the Irish Law Times of March, 1932 (volume LXVI, p. 64) is as follows:

"Bernstein Blood Test as Evidence.

"Judge Shannon, K. C., in Dublin Circuit Court on the 24th January last, had occasion to deal with evidence relating to the human blood-grouping system. The matter came before his Lordship on appeal from District Justice Reddin, under the Illegitimate Children (Affiliation Orders) Act, 1903, (No. 17), his Worship having decided (in the absence of medical evidence) that the defendant was the father of the plaintiff's child. Evidence was given pursuant to section 3 (2) of the Act. For the defence evidence was adduced to rebut the plaintiff's evidence and to show that the plaintiff had been intimate with a man other than the defendant.

"It was then intimated that medical evidence would be tendered on behalf of the defendant which would prove definitely that the child could not be the offspring of the plaintiff and the defendant. It was submitted for the plaintiff that the Court could not accept as accurate and infallible, a test such as was made pursuant to a theory which was only in existence for a relatively short period, and further, that the medical witnesses who had made the experiment could only give evidence from their own experience.

"Counsel for the defendant intimated that he would not ask the Court to accept as definite, infallible, and over-riding all other evidence, the result of the experiment made pursuant to the theory of Dr. Bernstein dealing with the grouping of blood but would ask that the Court accept the evidence, consider it in conjunction with the other evidence given, and give to the medical testimony the due weight that it would appear to warrant. The learned Circuit Judge decided to admit medical testimony.

"Dr. G. C. Dockeray, M.D., Rockefeller Research Fellow, T.C.D., testified that he, in the presence of Dr. Stephens, M.D., Clinical Pathologist, Adelaide Hospital, medical doctor for the complainant, took specimens of the blood of the plaintiff, the defendant, and the child, and that he then made the test pursuant to the Bernstein theory, which depends on Mendel's Law, now universally accepted, that there are four classes of human blood generally typed as follows; — AB, A, B, and O, so grouped because the blood agglutinates

differently in the four classes. Bernstein formed a theory that if certain parties co-habited, then, according to the agglutination of their own blood, the result of such union may have blood of different types, but, definitely, can not have blood of other type or types. That is to say, the child born can not have a type of blood which, according to the Bernstein theory, could not have been transmitted to the child by either or both parents.

"The following chart sets out for the practitioner the different possibilities of combinations together with (according to the Bernstein theory) the impossibilities:

| Parents | Offspring | |
|---------|-----------|---|
| | May be | Cannot be |
| AB+AB | AB, A or B | O |
| AB+A | AB, A or B | O |
| AB+B | AB, A or B | O |
| AB+O | A or B | AB or O |
| A+A | A or O | AB or B |
| A+B | AB, A, B or O | No group impossible |
| A+O | A or O | AB or B |
| B+B | B or O | AB or A |
| B+O | B or O | AB or A |
| O+O | O | AB, A or B |

"Dr. Dockeray deposed that he found the blood of the plaintiff to be of the class B, that of the defendant to be of the class AB, and that of the child to be of the class O. In his opinion, based on his own knowledge, and from reading learned treatises on the subject, the child could not have had the defendant for its father. Dr. McGrath, the State Pathologist, deposed that he concurred in the opinion, as a result of the test by Dr. Dockeray, that the child could not have the defendant as its father.

"Dr. Stephens, for the plaintiff, said he knew that a great amount of research and experiments had been made, and were still being made, by eminent pathologists the world over in connection with Bernstein's theory, but the medical profession had not as yet

universally accepted the results as infallible. He also knew that Courts in Germany and Austria had acted on the theory, but not in America, France or England, nor had it, as far as he knew, been offered in evidence in any of the Courts here.

"His Lordship allowed the appeal.

"It appears that this is the first time that the test has been taken as evidence in the British Isles. It is, of course, eliminative. The chances of error are said to be almost negligible if the test is carried out properly. We understand that the test will be used in connection with evidence to be given before Judge Davitt shortly in a seduction action."

In the same periodical for May, 1932 (volume LXVI, p. 111), appears the following comment on the case referred to in the previous article as being about to come on before Judge Davitt:

"Bernstein Blood Test as Evidence.

"The Bernstein theory—relating to the question of the human blood-grouping system—depends on what is known as Mendel's law, now universally accepted, that there are four classes of human blood.

"For the second time recently evidence based on the Bernstein theory as to consanguinity was adduced in the Dublin Circuit Court to assist the Judge in deciding a case of paternity. We have referred to the first case which was decided by Judge Shannon, K. C., on January 24th last (see our issue of March 12th, p. 64).

"The present case, which came before Judge Davitt last week, arose out of the alleged seduction by the defendant of the plaintiff's daughter. Evidence was given of the making of the Bernstein blood tests, and of the results of the analysis, by Dr. John McGrath, State Pathologist, and Mr. P. E. Hayden for the plaintiff, and by Sir. Wm. Taylor, Dr. Dockeray, T. C. D., and Dr. Wm. Pearson for the defendant.

"Judge Davitt said that at one time he had hopes that the distinguished medical evidence put before him gave him a prospect of having the issue made clear and definite. He was sorry to say that the result of the analysis left him in the position he would be without that evidence. It was absolutely inconclusive and might be left out of the case so far as assisting him in the slightest was concerned. He decided the case for the plaintiff on the other evidence.

"The Justice of the Peace for April 23, treating of the blood test as evidence, says that it will be something new in the law of evidence in England if the blood test is adopted in regard to paternity, but the fact that recently the Sleaford (Lincolnshire) justices adjourned an affiliation case for such a test to be made suggests that this Teutonic method is receiving attention (see I. L. T. and S. J. of April 2 last, p. 84). In January there was an appeal to the Dublin Circuit Court against an affiliation order, and the appeal was dismissed, after a blood test had been made. The pathologist in the Sleaford case could not report anything to assist the magistrates, and, as a matter of fact, this case also was dismissed.

"The English courts have never attached much importance to evidence of resemblance or alleged hereditary characteristics in pedigree and legitimacy suits and there is no reported case of a blood test being acted upon. In the German, Austrian, and to some extent in Scandinavian courts, however, it is by no means uncommon for a blood test to be carried out and the medical report thereon accepted in evidence. The Bernstein method is used by which the blood of the parents or supposed parents is tested according to a certain formula, and then the blood of the person or child concerned is tested to see if it corresponds with the particular category. Lawyers, however, may be excused for feeling some scepticism as to the positive value of such tests, in the present stage of this branch of medical science."

Without endeavoring to arrive at any decision on other questions involved in connection with this particular claim of error, we hold that the learned trial judge did not abuse his discretion in refusing to order the blood test requested by appellant. We base such holding specifically upon the proposition that it does not sufficiently appear from the record in this case that modern medical science is agreed upon the transmissibility of blood characteristics to such an extent that it can be accepted as an unquestioned scientific fact that, if the blood groupings of the parents are known, the blood group of the offspring can be necessarily determined, or that, if the blood groupings of the mother and child are known, it can be accepted as a positively established scientific fact that the blood group of the father could not have been a certain specific characteristic group. In other words, we think it insufficiently appears that the validity of the proposed test meets with such gen-

erally accepted recognition as a scientific fact among medical men as to say that it constituted an abuse of discretion for a court of justice to refuse to take cognizance thereof, as would undoubtedly be the case if a court today should refuse to take cognizance of the accepted scientific fact that the finger prints of no two individuals are in all respects identical. We therefore find no error here.

The tenth and eleventh groups of assignments present the claim of appellant that the evidence is insufficient to support the verdict, and this seems the most serious question to be dealt with in this case. To undertake to recite the evidence in detail would serve no good purpose. We have studied it with care. It could well be wished that it was more satisfactory and convincing. The prosecutrix frequently contradicted herself; some of her testimony is incredible, and some of it is patently (though perhaps not intentionally) untrue. We have finally, and after no inconsiderable doubt and hesitation, determined, however, that we ought not to say, upon the record before us, as a matter of law that there is no sufficient evidence to support the verdict.

Having given due consideration, we think, to all the contentions of appellant, and failing to find any prejudicial error, the judgment and order appealed from must be affirmed.

RUDOLPH, P. J., and ROBERTS and WARREN, JJ., concur.

POLLEY, J. (dissenting). I am not satisfied with the disposition, made by the majority of the court, of the assignment predicated upon the calling of defendant's wife to the witness stand. I think the objection of the appellant to the conduct of the state's attorney is well taken. The state's attorney was familiar with the provisions of section 2717, subd. 1, Rev. Code 1919, as amended by chapter 412, Laws 1921, to the effect that a wife cannot testify against her husband without his consent; he also knew, or could have known by asking defendant or his counsel, in the absence of the jury, that the defendant would not consent to have his wife testify against him. The state's attorney also knew that the defendant's wife was very hostile to defendant at the trial, and was doing everything within her power to aid in the prosecution of the case. Under these circumstances, the refusal of the defendant to permit his wife to testify against him would naturally suggest to

the minds of the jury that she knew facts that would be damaging to him in the trial, and that by refusing to permit her to testify he was withholding such facts from them. But this of itself would not have been so damaging. Defendant would have interposed his objection, the objection would have been sustained, and the incident would, to some extent at least, have been forgotten. But for the state's attorney to blurt out, as he did, when defendant was in the act of making his objection: "At this time, may it please the court, the state asks permission of the defendant to place his wife on the stand to testify" would naturally make a lasting impression on the minds of the jury, and it could have been done for no other purpose than to advertise to the jury the fact that the defendant was suppressing material evidence, and that for that reason he was afraid to permit her to testify. The jury would naturally feel that the defendant was keeping facts from them that would tend to prove the guilt of the defendant; and a juror might even go further and believe that the refusal of the defendant to permit his wife to testify was an admission by the defendant that he was guilty.

We recently reversed a judgment of conviction of robbery on the sole ground of misconduct of the state's attorney where the misconduct was far less flagrant than the conduct ecomplained of in this case. State v. Mitchell, 61 S. D. 147, 246 N. W. 635. In that case the misconduct consisted of asking questions that implied that the accused had been guilty of another crime unconnected with the one involved on the trial.

The question of misconduct of the state's attorney was considered at length in State v. La Mont, 23 S. D. 174, 120 N. W. 1104. That case, like this, was a prosecution against a father for raping his minor daughter. The misconduct consisted of the asking of improper questions on cross-examination. The offense of the state's attorney in that case was less flagrant than in this because in that case the state's attorney was acting in good faith, while in this case the offensive question was asked for the sole purpose of prejudicing the defendant. In the La Mont Case the matter was considered at considerable length, and the cases on the subject were collected and reviewed.